## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROGER ERVIN,

    Plaintiff,

    v.

CORIZON HEALTH,
MATTHEW CARPENTER, P.A.,
ASRESAHAGN GETACHEW, M.D.,

    Defendants.

Civil Action No.:  ELH-21-2386

## MEMORANDUM OPINION

The self-represented plaintiff, Roger Ervin, an inmate confined to North Branch Correctional Institution, filed a civil rights complaint, as amended, alleging that he has been denied appropriate medical care, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  *See* ECF 1, ECF 5, ECF 10.

Defendants Corizon Health, Inc. ("Corizon"); Asresahegan Getachew, M.D.; and Matthew Carpenter, P.A. have filed a motion to dismiss or, in the alternative, for summary judgment.  ECF 49.  The motion is supported by a memorandum (ECF 49-1) (collectively, the "Motion") and plaintiff's medical records.  ECF 49-2.

Mr. Ervin opposes the motion.  ECF 56, ECF 61.  Also pending are Mr. Ervin's motions for leave to file another amended complaint and for default judgment.  ECF 51, ECF 56.[1]

No hearing is necessary to resolve the motions.  Local Rule 105.6 (D. Md. 2021).  For the reasons that follow, I shall deny Mr. Ervin's motions and I shall grant defendants' Motion.

---

[1] Mr. Ervin's motion for default judgment also addresses the merits of his complaint.

# I.     Factual Background[2]

## A.     Complaint Allegations

Mr. Ervin has a history, *inter alia*, of serious eye issues.  This case concerns various medical issues of plaintiff, some of which were addressed in prior litigation initiated by plaintiff. *See Ervin v. Corizon Health, et al.*, ELH-19-1666 ("*Ervin I*"); *see also Ervin v. Wexford*, ELH-16-2964.  For convenience, I shall refer to the instant case as "*Ervin II*."[3]

### 1.     Sinusitis

In my Memorandum (ECF 3) and Order (ECF 4) of October 4, 2021, plaintiff was permitted to amend his suit.  But, he was expressly limited to facts and events that were not previously considered in *Ervin I*, and which occurred since May 13, 2020, when *Ervin I* was decided.  ECF 2 at 2, ¶ 4; ECF 3 at 2; *see also Ervin I*, ECF 59, ECF 60.

Then, in this case, pursuant to a Memorandum (ECF 12) and Order (ECF 13) docketed on December 3, 2021, plaintiff was again permitted to clarify and supplement his suit as to his sinusitis.  ECF 13, ¶ 6.  In particular, in ECF 12, the Court noted that, in a prior suit filed by Ervin in 2016 (ELH-16-3964), plaintiff had alleged that he was not provided with appropriate care after sinus surgery in January 2017.  *Id.* at 7 (citing *Ervin v. Wexford*, ELH-16-3964, ECF 51). Nevertheless, I granted Mr. Ervin the opportunity to supplement his current claim regarding his sinusitis.  *Ervin II* at 11.

Further, the Memorandum indicated that Mr. Ervin's claims "will move forward" as to the post-surgery follow up care at Johns Hopkins Hospital; his need for additional surgery to his eyes;

---

[2] To the extent relevant, I incorporate the factual summary in ELH-19-1666, ECF 59.

[3] In actuality, this case is one of many cases filed by Mr. Ervin over the years.

his claim of delay as to medical care for his eyes; and whether his current condition qualifies as a disabled individual, entitled to accommodations, pursuant to the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*  ECF 12 at 11.

As to plaintiff's claim regarding his sinuses, I stated, ECF 12 at 7-8:

> In the first amended complaint, Mr. Ervin alleges that Matthew Carpenter, a Physician's Assistant at North Branch Correctional Institution ("NBCI"), never responded to the allegations raised in *Ervin I* and that "the rest of the Defendants was send [sic] to low court under Supplemental Complaint." ECF 5 at 2, 7.[1] Mr. Ervin adds that Corizon and Carpenter knew he had a chronic sinus condition that caused him pain and suffering because Mr. Ervin wrote to corporate headquarters while *Ervin I* was pending in this court, stating he was suffering from chronic sinusitis.  *Id.* at 16.  Mr. Ervin adds that he does not have high blood pressure, does not need to take medication to treat it, but instead it is his sinus condition that is causing his stress as well as his elevated blood pressure.  *Id.* at 18.

> In his second amended complaint Mr. Ervin alleges that Carpenter was made aware of plaintiff's chronic conditions and need for a follow up appointment after his sinus surgery, but allegedly failed to take action. ECF 10 at 4-5, ¶ 3. Mr. Ervin adds that Carpenter was one of the "first people" to see Mr. Ervin after the surgery to his sinus and to his eyes. *Id*. at 10, ¶19.

> In a prior lawsuit, initiated in 2016, Mr. Ervin alleged he was not provided appropriate care after he received sinus surgery on January 24, 2017. *See Ervin v. Wexford*, Civil Action ELH-16-3964 (D. Md. 2016), ECF 51 (Mem. Op. denying preliminary injunction) at 3. To the extent that Mr. Ervin is attempting to revive a claim regarding his medical care following his sinus surgery, the claim is barred by the doctrine of res judicata and will not be revisited here.  In addition, the absence of any specific date with regard to this allegation against Carpenter makes this claim virtually impossible for Carpenter to respond to it in any meaningful way.  *See Swierkiewicz v. Sorema N. A*., 534 U.S. 506, 512 (2002) (complaint must give defendant fair notice of the claim).  According to Mr. Ervin, Dr. Getachew promised him, on an unknown date, that he would be sent out for an MRI of his sinuses.  ECF 10 at 9-10.  Mr. Ervin states his sinus medication was discontinued even though he has chronic sinusitis, but he does not state who discontinued his medication or when it was discontinued. *Id*. Moreover, he does not explain why the failure to provide him with an MRI has caused him harm.

In the supplements received after the filing of ECF 12, Mr. Ervin indicated that defendants began to provide him with high blood pressure medication but stopped the medication for his sinus

condition.  ECF 15 at 1-2; ECF 21 at 2 (alleging sinus cyst near eye); ECF 23 at 3.  Mr. Ervin states again that he does not have high blood pressure; rather, it is the cyst in his sinus and the pain in his eye that causes his nose bleeds and his elevated blood pressure.  ECF 23 at 4.

In a later "status report" (ECF 27), Mr. Ervin claims that since his sinus medication was stopped he has had difficulty breathing and has nosebleeds.  *Id.* at 2, ¶ 2; *see also* ECF 31 (correspondence docketed February 7, 2022) at 3 (alleging "chronic nosebleeds").  He also claims that the sinus pain causes his eye pressure to increase.  *Id.*

In plaintiff's opposition (ECF 44) to defendants' motion for extension of time (ECF 40), Mr. Ervin states that he had a cyst in his left sinus that was surgically removed but two smaller ones in the right sinus were too small to remove.  ECF 44 at 2.  Mr. Ervin claims the surgery was performed at Mercy Hospital by an ENT who ordered treatment.  *Id.*  According to Ervin, defendants discontinued all of his sinus medication and treatment.  *Id.*  In support of this assertion, Mr. Ervin attaches a medical record dated May 10, 2017, documenting his complaints of nosebleeds and his request for follow-up care from an ENT.  ECF 44-2.

### 2.   Glaucoma

Plaintiff states that he suffers from a chronic condition for which he must be seen every 90 days.  ECF 10 at 5.  He claims that the surgery he received on his left eye to treat glaucoma was done pursuant to a court order.  *Id.*  Although the surgery was performed on May 13, 2020, Mr. Ervin claims the follow-up visit to Wilmer Eye Institute at Johns Hopkins Hospital did not occur for well over five months.  *Id.*

Mr. Ervin asserts that he was seen on October 3, 2020, by Dr. Alesha Spellman-Smith, an optometrist.  *Id.* at 5-6.  Dr. Spellman-Smith told Mr. Ervin that he needed to return to Johns Hopkins on an emergency basis because both of his eyes were swollen, infected, and "hard as

rocks." *Id*. at 6.  Dr. Spellman-Smith noted that Mr. Ervin's follow-up appointment was overdue and that she was going to prescribe something for his infection.  *Id*.

According to Mr. Ervin, he has not received the eye drops that were prescribed for him. ECF 10 at 6.  Further, he maintains that his numerous sick call slips went unanswered.  *Id*.[4]

On January 4, 2021, Mr. Ervin had a telemed appointment with Dr. Getachew, and he relayed what Dr. Spellman-Smith had said on October 3, 2020.  ECF 10 at 6-7.  Mr. Ervin also told Dr. Getachew that he was in a lot of pain.  *Id*. at 7.

Plaintiff was seen by Dr. Green-Simms,[5] an ophthalmologist, in March 2021.  ECF 10 at 7; *see also* ECF 49-2 at 166-78 (medical record generated by Dr. Green-Simms).  Mr. Ervin recalls that Dr. Green-Simms told him his eyes were swollen and needed to be drained.  *Id*.  She also told him that his left eye needed to be removed and that there was a big hole in his eyeball.  *Id*.  At that time, Mr. Ervin claims he was in so much pain that he could not lay on his left side or tolerate any direct light to his eyes.  *Id*.  He alleges that Dr. Green-Simms reported that he needs to return to Johns Hopkins on an emergency basis and if that is not done in 30 days, he should be brought back to her.  *Id*. at 8.

Mr. Ervin was seen at Johns Hopkins Wilmer Eye Institute on May 19, 2021.  He states it was determined at that time that he needed urgent surgery to close the hole in his eye that was left from removal of a shunt, and that his left eye needed to be removed.  ECF 10 at 8.  Mr. Ervin claims that the Johns Hopkins doctors told him that they would not have put the shunt in place if they knew it would take him two years to return, and informed him that the shunt was in place for

---

[4] This assertion is not supported by the medical records submitted by defendants.  *See generally* ECF 49-2.

[5] Mr. Ervin incorrectly refers to Dr. Green-Simms as "Dr. Green."  *See* ECF 49-2 at 62 (referencing Dr. Amy Green-Simms).

so long that it damaged the optic nerve. *Id*. Further, he claims the doctors told him, "This is not your fault they should have brought you back." *Id*.; *see also* ECF 49-2 at 186 (onsite consultation form dated May 17, 2021 indicating plaintiff needs eye removal (enucleation) and glaucoma surgery on the right).

On June 21, 2021, Mr. Ervin received laser surgery to close the hole in his eye. ECF 10 at 8. He states that he went back to Johns Hopkins on June 30, 2021, for a follow-up and it was determined that he needed further testing. *Id*.

According to Mr. Ervin, defendants are "denying treatment for a potentially life-threatening condition as a cost-saving measure." ECF 23 at 2-3. He alleges that defendants have failed to carry out the recommendations and orders provided by Johns Hopkins physicians, who directed Mr. Ervin to return on July 28, 2021, for removal of his left eye. *Id*. at 3. He also claims that defendants discontinued his Baclofen prescription, which controls muscle spasms, increasing the risk that he may fall. *Id*.

### 3.      ADA accommodation

Mr. Ervin claims that I ordered defendants to provide him with reasonable accommodations due to his visual impairment, but no accommodations have been provided.[6] Rather, Mr. Ervin has been confined on disciplinary segregation. ECF 5 at 2, 5. It is also Mr. Ervin's belief that the only reason I did not order his transfer to another prison was due to his failure to specify the prison where he wanted to be sent. *Id*. Additionally, Mr. Ervin claims that Dr. Getachew told him he

---

[6] An order was issued by the Honorable Kevin Wilson, an associate judge of the District Court for Baltimore City, stating that Mr. Ervin was visually impaired and entitled to accommodations. ECF 49-2 at 158. The copy of the Order is of poor quality. But, the order appears to direct the Maryland Division of Correction and any other penal facility to make reasonable accommodations for Mr. Ervin. *Id*. The only defendant in that case was "Wexford Health Services, Inc." *Id*.

would ensure that reasonable accommodations would be provided due to his visual impairment. ECF 5 at 6.

Mr. Ervin continues to claim that Corizon and Carpenter did not answer the claims raised against them in *Ervin I* and that "the case was send [sic] to the low [sic] court under supplemental." ECF 5 at 7.  He contends that Corizon, Carpenter, and Getachew knew he is disabled due to his visual impairment but allowed him to be held in disciplinary segregation while he suffered in pain. *Id*.

During a visit with Dr. Getachew on February 15, 2021, Mr. Ervin explained that he needed a "court order for reasonable accommodation" due to his visual impairment.  ECF 10 at 7.  Further, he asked if Dr. Green-Simms could "state on record" the condition of his eyes so that he would be able to get the help he needs for his parole hearing.  *Id*.  Dr. Getachew responded that he did not understand what Mr. Ervin was talking about.  *Id*.

Mr. Ervin contends that defendants are jeopardizing his life because they are not allowing correctional staff to know that he is visually impaired and that he needs reasonable accommodation.  ECF 10 at 9.  He claims he falls down a lot and states: "Everyone watch me fall down coming and going to [the] shower until one official's [sic] step up & stated this man need a wheelchair & a handicap shower & cell before he hurt one of our officials' [sic] falling down."  *Id*. Mr. Ervin asserts that "RNP Pierce" told Dr. Getachew that plaintiff needs a wheelchair.  *Id*.  *See* ECF 49-2 at 134 (Getachew noting MRI needed on June 28, 2021).

## B.    Defendants' Response

Defendants have provided certified medical records in support of their Motion (ECF 49-2).  The records consist of almost 200 pages.  *Id.*  Much of what follows is derived from the records.

On August 21, 2017, Mr. Ervin had an "Ahmed tube shunt" surgically implanted in his left eye at Johns Hopkins Wilmer Eye Institute. ECF 49-2 at 169. When the shunt became exposed, Mr. Ervin was offered corrective surgery but initially refused it. *Id*.

Mr. Ervin had surgery on his left eye on November 14, 2019, to remove the exposed shunt, as well as laser surgery, known as cyclophotocoagulation,[7] to address his glaucoma. ECF 49-2 at 169. The procedure was performed by Dr. Thomas Vincent Johnson, III. *Id*.

From July 29 through November 29, 2020, Mr. Ervin was prescribed the following eye drops: Cosopt[8] twice a day to both eyes; Xalatan[9] once a day in both eyes; and Brimonidine Tartrate[10] twice a day in both eyes. ECF 49-2 at 36.

On October 19, 2020, Mr. Ervin refused to attend an ophthalmology appointment, insisting he needed a wheelchair to do so. ECF 49-2 at 39. However, when Mr. Ervin was offered a wheelchair, he continued to refuse to come out of his cell. *Id*. At that time Mr. Ervin had a one-year prescription for Xalatan, Cosopt, and Brimonidine Tartrate. *Id*.

Mr. Ervin was seen by Dr. Getachew on October 26, 2020, for a chronic care visit. ECF 49-2 at 41. Dr. Getachew noted that Mr. Ervin has a long history of angle-closure glaucoma treated

---

[7] Cyclophotocoagulation is a laser treatment that targets the ciliary processes to reduce aqueous humor production. *See* https://www.brightfocus.org/glaucoma/article/glaucoma-surgery-series-cyclophotocoagulation (last visited July 29, 2022).

[8] Cosopt is a prescription eye drop containing dorzolamide, which reduces the amount of fluid in the eye, and thereby decreases pressure inside the eye. It is prescribed for treatment of open angle glaucoma. *See* https://www.drugs.com/cosopt.html (last visited July 29, 2022).

[9] Xalatan is an ophthalmic solution used to treat glaucoma or other conditions that increase intraocular pressure by increasing the amount of fluid that drains from the eye. *See* https://www.drugs.com/xalatan.html (last visited July 29, 2022).

[10] Brimonidine ophthalmic is used to reduce pressure inside the eyes in people with open-angle glaucoma or ocular hypertension. *See* https://www.drugs.com/mtm/brimonidine-ophthalmic.html (last visited July 29, 2022).

with the placement of an Ahmed tube shunt in 2017.  ECF 49-2 at 41.  Dr. Getachew noted that the tube shunt was exposed "because the patient was noncompliant."  *Id*.  When Mr. Ervin was evaluated by John Atkins on October 10, 2019, removal of the tube was recommended.  *Id.*  One month later, it was removed.  *Id*.

Dr. Getachew noted that Mr. Ervin had no vision in his left eye and would be scheduled for a follow-up visit with ophthalmology at Johns Hopkins.  *Id*.  The following day, when Mr. Ervin was given the opportunity to attend his follow-up appointment, he refused.  *Id*. at 43.  Dr. Getachew noted that the "management of this patient is challenging because of his noncompliance."  *Id*.  Dr. Getachew "advised the team to schedule the patient to see onsite ophthalmologist."  *Id*.

On January 1, 2021, Dr. Getachew saw Mr. Ervin via telemedicine for a follow-up as to his glaucoma and chronic back pain.  ECF 49-2 at 49.[11]  At that time, Mr. Ervin complained about swelling of his left eye in the morning since the tube had been removed.  *Id*.  Dr. Getachew told the nurse in attendance at the appointment to schedule Mr. Ervin to see the onsite ophthalmologist. *Id*.  In the meantime, Dr. Getachew prescribed erythromycin eye ointment.  *Id*.  Additionally, Dr. Getachew noted that Mr. Ervin is legally blind and requested "signage on his door to alert officers about his disability."  *Id*.  Dr. Getachew also asked the nurse to send notification to custody regarding Mr. Ervin's poor vision.  *Id*.  When Mr. Ervin mentioned that he was unable to walk long distances due to his chronic back pain, Dr. Getachew asked the nurse to request a wheelchair for Mr. Ervin to use for long distances.  *Id*.

---

[11] In March of 2020, the world was in the clutches of the COVID-19 pandemic.  Many people began to see their doctors via electronic media.

Dr. Getachew saw Mr. Ervin again on February 15, 2021, via telemedicine.  ECF 49-2 at 55.  Dr. Getachew noted that Mr. Ervin raised complaints of chronic back pain "with a spasm sensation."  *Id*.  He noted that Mr. Ervin has "good control of his bladder and bowel, however he complains of weakness of his legs when he stands up."  *Id*.  Further, Dr. Getachew noted that he "advised the nurse to provide instruction to custody to allow him to use handicap shower if it is available."  *Id*.[12]  To address his back pain, Dr. Getachew prescribed Tegretol and Baclofen.  *Id*.

With regard to Mr. Ervin's glaucoma, Dr. Getachew noted that since the shunt was removed from Mr. Ervin's left eye he has complained of swelling of the eye.  ECF 49-2 at 55.  The nurse was told to schedule Mr. Ervin to see the "onsite ophthalmologist and follow his recommendation."  *Id*.  Dr. Getachew noted that a telemedicine appointment with the ophthalmologist would not be appropriate for Mr. Ervin given that he is legally blind and wheelchair bound.  *Id*.  When the scheduler was contacted for purposes of getting Mr. Ervin an ophthalmology appointment, the scheduler confirmed he would be scheduled but also noted that he had been on the schedule for January.  *Id*. at 57.

Dr. Amy Green-Simms saw Mr. Ervin at NBCI on March 19, 2021.  He was 59 years old at the time.  *Id.*  She recommended that he return to Johns Hopkins Wilmer Eye for a consultation on glaucoma surgery versus "enucleation," ECF 49-2 at 62, *i.e.*, removal of his left eye.  *Id.*

On April 6, 2021, Dr. Howard Cook saw Mr. Ervin for hypertension, back pain, and glaucoma.  ECF 49-2 at 70.  Dr. Cook noted that Mr. Ervin's "hypertension is uncontrolled."  *Id*.  At this time, Mr. Ervin's blood pressure was 157/100.  *Id*. at 71.  Mr. Ervin told Dr. Cook that he

---

[12] Karen J. Coleman, RN, was the nurse present during the telemedicine appointment.  She noted that Mr. Ervin was allowed to use the handicap shower, but custody requested paperwork from medical.  ECF 49-2 at 57.

wanted a follow-up evaluation for his glaucoma.  *Id.* at 70.  The next day, Sheena M. Bowman, MRC, made a notation in Mr. Ervin's record.  *Id.* at 73.  It states that Mr. Ervin was on the schedule for a follow-up visit on April 20, 2021.  *Id.* at 73.  But, the medical records do not include a record of an ophthalmology appointment taking place on April 20, 2021.

On April 16, 2021, Mr. Ervin told Frank Mborgo, LMSW, of his desire to transfer to Roxbury Correctional Institution.  ECF 49-2 at 78.  He also explained that he minimizes the extent of his disability due to his fears that other inmates will take advantage of him.  *Id.*

Dr. Cook saw Mr. Ervin on April 30, 2021.  ECF 49-2 at 79.  Mr. Ervin's blood pressure was 197/115.  *Id.* at 80.  Dr. Cook discussed the importance of plaintiff taking his blood pressure medication.  *Id.* at 79.  Mr. Ervin responded that his ophthalmologist "told him his [hypertension] was connected to his Glaucoma and he gleaned from that that he should not take the blood pressure medication."  *Id.*  Dr. Cook attempted to disabuse Mr. Ervin of that belief, but Mr. Ervin then said that his blood pressure "was connected to his 2400 calorie ADA diet and if he was given the diet his blood pressure would be controlled."  *Id.*  Dr. Cook told Mr. Ervin that "those two things do not go together, and that he will have a stroke if he does not control his blood pressure."  *Id.*

Dr. Henry D. Jampel from Johns Hopkins Wilmer Eye Institute evaluated Mr. Ervin on May 18, 2021.  ECF 49-2 at 167-78.  Dr. Jampel noted that the pressure in both eyes (abbreviated "OU")[13] is well controlled with the eye drops that plaintiff was using.  *Id.* at 169.  Dr. Jampel's assessment and plan for Mr. Ervin was to schedule him for cyclophotocoagulation on his left eye (abbreviated "OS") within the next few weeks.  ECF 49-2 at 171.  Mr. Ervin reported that both of his eyes were causing him pain.  *Id.*  No objective cause for pain could be determined in connection

---

[13]    *See*    https://www.aao.org/young-ophthalmologists/yo-info/article/learning-lingo-ophthalmic-abbreviations (last visited July 29, 2022).

with plaintiff's right eye (abbreviated "OD"), as the intraocular pressure ("IOP") was "under good control" in that eye. *Id.* But, the pressure in plaintiff's left eye was "out of control and subjectively painful." *Id.*

Dr. Cook discussed Mr. Ervin's glaucoma and his hypertension during a provider visit on May 21, 2021. *Id.* at 85. Dr. Cook noted that Mr. Ervin was still insisting that he should not take medication to control his blood pressure "as if he is making some sort of deal with the medical staff which he is not." *Id.* Dr. Cook advised Mr. Ervin that failure to take the medication for his blood pressure could cause plaintiff to have a stroke and that he should take the medication. *Id.* Dr. Cook also noted that Mr. Ervin discussed "in great detail what happened at the Wilmer eye institute" and that he was "supposed to go back to have the eye surgery." *Id.*

Mr. Ervin was seen by Dr. Getachew on June 1, 2021, to review the notes from his visit with Dr. Jampel. ECF 49-2 at 95. Dr. Getachew recommended scheduling Mr. Ervin for an onsite ophthalmology exam for purposes of generating "the appropriate consult for the surgery" recommended by Dr. Jampel. *Id.* at 95, 104. On June 7, 2021, Mr. Ervin received a pre-operative exam for the cyclophotocoagulation procedure from Dr. Cook. *Id.* at 109-11; 189-90.

Mr. Ervin was transported to the Wilmer Eye Institute on June 21, 2021, for surgery on his left eye. ECF 49-2 at 117-18. Mr. Ervin returned to Western Correctional Institution ("WCI") at 3:05 p.m., following his surgery. *Id.* at 119-20. The following day, Dr. Aaiysa N. Ansari-Lawal examined Mr. Ervin and noted that he had a follow-up appointment at Wilmer scheduled for June 30, 2021. *Id.* at 131. He was discharged from the infirmary at WCI and returned to general population at NBCI at 6:20 p.m. on June 22, 2021. *Id.* at 129 and 131.

On June 30, 2021, Mr. Ervin saw Dr. Morohunranti Oguntoye-Ouma at Johns Hopkins. ECF 49-2 at 188. Mr. Ervin reported that his eye was still uncomfortable, and Dr. Oguntoye-

Ouma noted that the vision in his left eye was still limited to light perception (abbreviated "LP"). *Id*. The pressure in Mr. Ervin's eyes was "well controlled" with the eye drops that had been prescribed. *Id*. Dr. Oguntoye-Ouma also noted that if Mr. Ervin continued to have pain, they would need to consider "thorazine/enucleation" and advised Mr. Ervin that "vision loss would be irreversible in his left eye after either surgery." *Id*. Dr. Oguntoye-Ouma reported that the "right eye is also LP though patient likely has better than LP vision given that he is able to reach out to objects and recognize clinic staff." *Id*. A follow-up appointment was recommended at four weeks post-exam, and Mr. Ervin was not supposed to continue use of the intraocular pressure lowering eye drops. *Id*.

A chart update for February 2, 2022, written by Lori Keister, LPN, states that Mr. Ervin has paperwork for a wheelchair to be used for long distances, a bottom bunk, use of the handicap-accessible shower, and no wool blankets. ECF 49-2 at 150.

## C. Non-dispositive motions

Mr. Ervin filed motions for leave to file an amended complaint and for default judgment. ECF 51; ECF 56. I turn to those motions.

### 1. Motion for Leave to file Amended Complaint (ECF 51)

In his motion for leave to file an amended complaint, Mr. Ervin states that Johns Hopkins providers told him that his condition is deteriorating and that medical orders are still not being followed. ECF 51 at 1. He states that this is why he asked for discovery earlier in this case, which was denied by this court. *Id*. at 2; *see also* ECF 42 (Mem. denying motion to compel discovery), at 3-4.

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend [his] pleading once as a matter of course within: A) 21 days after serving it, or B) if the pleading is one

to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, Rule 15(a)(2) dictates that "[t]he court should freely give leave when justice so requires."

Although leave to amend must be freely given, leave to amend may be denied where the proposed amendment "would be prejudicial to the opposing party, or the moving party has acted in bad faith, or the amendment would be futile." *See Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010). Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." *Katyle v. Penn Nat. Gaming, Inc.*  637 F.3d 462, 471 (4th Cir. 2011) (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir. 2008)).

As a "general rule, 'an amended pleading ordinarily supersedes the original and renders it of no legal effect.'" *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (quoting *Crysen/Montenay Energy Co. v. Shell Oil Co*., 226 F.3d 160, 162 (2d Cir. 2000) (noting exception for purposes of appellate review of claims dismissed in original complaint that were not included in amended complaint)); *see also Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).

Mr. Ervin's proposed amended complaint consists of conclusory statements and does not state a cognizable claim. ECF 51. Absent from the proposed amended complaint are basic facts such as what medical care was ordered and by whom as well as who has declined to honor those orders. Although a Complaint need not contain detailed allegations, the facts alleged must be

14

enough to raise a right to relief above the speculative level and require "more than labels and conclusions," as "'courts are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 561.

Mr. Ervin has not satisfied these basic requirements with the proposed amended complaint. Therefore, the motion shall be denied.

### 2.   Motion for Default Judgment

In his motion for default judgment, Mr. Ervin contends that defendants failed to respond to the Complaint in a timely manner. ECF 54. He focuses on when he received defendants' Motion and the fact that this Court granted two extensions to the defense.

Under Fed. R. Civ. Proc. 55(a), default may be entered "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." But, the failure to plead or defend does not automatically entitle a plaintiff to entry of default judgment.

The decision to enter default is left to the discretion of the Court. *See Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002). Entry of default judgment is not favored and is reserved for cases where the adversary process has been halted by an unresponsive party. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993).

In this case, there has been no failure to plead, nor has the adversary process been halted. Accordingly, Mr. Ervin's motion for default judgment shall be denied.[14]

## II.      Standards of Review

### A.

A motion under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Twombly*, 550 U.S. at 555-56.

---

[14] To the extent that Mr. Ervin includes argument as to why defendants should not be granted summary judgment in their favor in his motion for default judgment, I consider those arguments as part of Mr. Ervin's opposition.

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317-18 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). And, the court must accept as true all facts alleged in the suit, and draw all reasonable inferences from those facts in favor of the plaintiff. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).

To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted). And, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, ___ Fed. App'x ___, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).

Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (citation omitted).

The pleadings of a self-represented litigant are construed generously to allow for the development of a potentially meritorious case. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). But, a court cannot ignore a clear failure to allege facts setting forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may properly be addressed.") (internal citation omitted)). "A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are not more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 665.

**B.**

The motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable

opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x 220, 222 (4th Cir. 2016) (per curiam).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th

Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d);  *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom, Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"   *Harrods,* 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion

when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Mr. Ervin has not filed an affidavit under Rule 56(d).  Moreover, I am satisfied that it is appropriate to address the pending Motion as one for summary judgment, as this will facilitate resolution of the case.

## C.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651 659 (4th Cir. 2018).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

Indeed, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the

witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Brown v. Lott*, ___ F. App'x ___, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp.*, 436 F.3d at 432.

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (citation omitted). But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, ___ F. 4th ___, 2022

23

WL 2901043, at *9 (4th Cir. July 22, 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord. Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346

F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79

(4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### D.

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit

against any person who, acting under color of state law, "subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42

U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City

State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police

Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive

rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v.

Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  In

other words, § 1983 allows "a party who has been deprived of a federal right under the color of

state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687,

707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the

Constitution or laws of the United States was violated, and (2) that the alleged violation was

committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48

(1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S.

823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins

v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Notably, § 1983 does not regulate "private conduct, no matter how discriminatory or

wrongful."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  But, in certain

circumstances, a private actor's conduct may be regarded as State action, not private action. Section 1983 extends to private entities that operate under color of state law, such as a private prison health care provider. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016).

The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. Thus, § 1983 requires a showing of personal fault based upon a

defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983.

Liability of supervisory officials in a § 1983 action "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

### III.   Discussion

In sum, defendants contend that Mr. Ervin fails to state an Eighth Amendment claim for deliberate indifference to his serious medical need and fails to state a medical malpractice claim because he has not filed a claim with the Health Claims Arbitration Board, as required by Md. Code, Cts. & Jud. Proc. § 3-2A-04 *et seq*.  ECF 49-1 at 11-14.  Additionally, defendants state that Mr. Ervin fails to include allegations concerning the manner in which Corizon is liable, and fails to show how Dr. Getachew and P.A. Carpenter caused him harm. *Id*. at 14-15.

27

## A.    Corizon

As noted, § 1983 liability requires a showing of personal conduct that amounts to a violation of a federal constitutional right.  The claim against Corizon is predicated solely upon a theory of respondeat superior.  *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. App'x. 279, 282 (4th Cir. 2009).

Mr. Ervin faults Corizon for the failure to provide him with ADA accommodations and for failing to intervene on his behalf after he notified the CEO about his chronic sinus condition and chronic back pain.  ECF 5 at 16.  But, the circumstances of Mr. Ervin's housing within the prison are not a matter within Corizon's authority.  *See* Code of Maryland Regulations 12.02.24.02. A (3) and (4) (designating correctional staff to assign housing and determine propriety of transfers between correctional facilities).

To the extent that Mr. Ervin implies that Corizon is liable for any failure by its employees to advocate for his removal from disciplinary segregation and placement in a handicap accessible cell, that theory of liability is one of respondeat superior.  Such a claim is inapplicable under § 1983.  Therefore, plaintiff has not stated a claim against Corizon and the suit shall be dismissed as to Corizon.

## B.    Eighth Amendment Claim

The Eighth Amendment protects the rights of prisoners.  *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)).  It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and

unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

"It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).  For a plaintiff to prevail in an Eighth Amendment suit asserting the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

An Eighth Amendment claim for deliberate indifference to serious medical needs "includes objective and subjective elements." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was provided. *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *Schilling*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016).

Thus, proof of an objectively serious medical condition does not end the inquiry. As the Court explained in *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017): "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

In the context of a claim concerning allegedly inadequate medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."); *see Mays*, 992 F.3d at 300.

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted).  Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  However, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

Mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).  Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Formica*, 739 F. App'x at 754; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").

31

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012). And, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in

original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970).   Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs."  *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  And, reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury.  Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'"  *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98.  But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury."  *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

### 1.    Glaucoma

Mr. Ervin has received extensive treatment for his glaucoma.  Although there may have been some delays in bringing Mr. Ervin back to Johns Hopkins for follow-up appointments, Mr. Ervin was seen by onsite ophthalmologists to ensure his glaucoma had not worsened.  In addition, the medical records submitted by defendants include several entries detailing Mr. Ervin's lack of cooperation with the treatment plan formulated to address the issues with his left eye.  *See* ECF 49-2 at 12, 39, 41, 43, 46, 71, 73, 79, and 155.  Each time Mr. Ervin refuses a medical appointment, a delay in addressing his concerns is inevitable.  However, even with the delays caused by Mr.

Ervin's refusals, the treatment he has received for his glaucoma passes constitutional muster. There is no evidence that Dr. Getachew or Matthew Carpenter have exhibited a callous disregard for Mr. Ervin's serious medical need, *i.e.*, his glaucoma.

In his opposition, Mr. Ervin states he was due back at Johns Hopkins Wilmer Eye Institute for a follow-up appointment on May 18, 2022, but he had not been sent back as of June 2, 2022. ECF 61 at 3, ¶ 6. It is not entirely clear what the follow-up appointment was meant to address, as Mr. Ervin does not explain the reason he was to return nor how the delay has caused him harm. *Id.* Even assuming a follow-up appointment was supposed to take place on May 18, 2022, the delay of 15 days is not enough to establish an Eighth Amendment violation.

Therefore, with regard to the medical care provided to plaintiff *prior to May* 2022, defendants Dr. Getachew and Carpenter are entitled to summary judgment in their favor.

**2.      Sinusitis**

Mr. Ervin has voiced his erroneous belief that polyps located in his sinus that were too small to be removed during the surgery he received in 2016 are the cause of his high blood pressure. ECF 5 at 6. Further, he believes that the withdrawal of medication he was taking to treat his sinuses exacerbated any issue with his blood pressure. *Id.* He has held onto these beliefs, as well as other theories regarding the cause of his high blood pressure, despite the warnings given to him by medically trained professionals. *See* ECF 49-2 at 79-80, 85.

This claim is based on Mr. Ervin's disagreement with the medical diagnoses provided by his medical providers. The claim that two cysts in his sinus that were too small to be surgically removed in 2017 are the cause of both his high blood pressure and his worsening glaucoma is unsupported by any objective evidence. *See* ECF 44 at 2; ECF 44-2 (2017 medical record), *see also* ECF 49-2 at 85 (Mr. Ervin was advised that failing to take the medication for his blood

pressure could cause him to have a stroke and that he should take the medication). Rather, it is based entirely on Mr. Ervin's subjective beliefs. *See Heyer*, 849 F.3d at 210 (defining a serious medical need as one that has been acknowledged by a physician as mandating treatment).

To the extent that Mr. Ervin asserts that defendant Carpenter is liable for the failure to treat his sinusitis because he examined Mr. Ervin after his 2017 sinus surgery, the claim must fail. There is no allegation that Carpenter knew of a serious medical condition requiring treatment, nor is there any objective evidence to support such a claim. *See Iko*, 535 F.3d at 241 (requiring actual knowledge of risk of harm to inmate and recognition that actions to address the risk were insufficient to establish 1983 liability for constitutional violation).

Mr. Ervin sued Carpenter in *Ervin I* and his claim was dismissed for failure to state a constitutional claim. *Ervin I*, ELH-18-1666, ECF 59 at 42 (finding that Mr. Ervin's generalized claims against the entire "medical team" involved in his care failed to state a claim as to Carpenter). Mr. Ervin has added nothing more to the claim against Carpenter in this lawsuit. Therefore, under the rationale expressed in *Ervin I*, Carpenter is entitled to summary judgment.

## C.    ADA claim

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id*. § 12101(b)(2). Title I of the ADA prohibits discrimination against individuals with disabilities in employment. *See id*. § 12111 *et seq*. Title III applies to public accommodations. *See id*. § 12181 *et seq*.Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local

35

government," *id*. § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id*. § 12132.

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State prisoners, such as plaintiffs, may qualify as "qualified individual[s] with . . . disabilit[ies]," *id*., so as to come within the protection of Title II of the ADA. In *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998), a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates."

Several circuits "have determined that § 12132's words 'or be subjected to discrimination by that entity' are meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context'"—in other words, that Title II of the ADA applies to "anything a public entity does." *Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority). To my knowledge, the Fourth Circuit has not squarely addressed the issue.

To prevail under an ADA Title II claim, "a plaintiff must show that [he or] she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Constantine*, 411 F.3d at 499 (emphasis omitted); *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016). The Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or

disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Lamone*, 813 F.3d at 503 n.5 (citing *A Helping Hand, LLC v. Baltimore*, 515 F.3d 356, 362 (4th Cir. 2008)).  "'Discrimination' includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *Seremeth*, 673 F.3d at 336 (quoting 42 U.S.C. §12112(b)(5)(A)); *see Paulone*, 787 F. Supp. 2d at 372.

The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide.  *See, e.g.*, *Seremeth*, 673 F.3d at 336 (in Title II action, noting that "'[d]iscrimination' includes 'not making reasonable accommodations….'") (quoting § 12112(b)(5)(A) (from Title I's definition); *see Paulone*, 787 F. Supp. 2d at 372 (discussing the equivalence of "reasonable accommodations" and "reasonable modifications"));  *Robertson v. Las Animas Sheriff's Dep't*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

Under the rubric of "reasonable modifications," the statute defines "auxiliary aids and services" to include the following:

> (A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
> (B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
> (C) acquisition or modification of equipment or devices; and
> (D) other similar services and actions.

42 U.S.C. § 12103(1). The statutory definition is not exclusive, however. Pursuant to Congressional authorization, *see* 42 U.S.C. § 12134(a), the Justice Department has promulgated, by regulation, a more expansive listing of auxiliary aids and services. *See* 28 C.F.R. § 35.104.

Mr. Ervin does not dispute that he has been provided with a "full time wheelchair outside of cell," which is designated as a single, handicapped cell. ECF 56-1 at 1. He takes issue with the fact that the order issued on April 19, 2022, is temporary and expires in one year. ECF 56 at 3. He indicates that there is some confusion among correctional staff as to which order they should follow, which is likely caused by the overlap of a one-year order issued on February 2, 2022, directing that Mr. Ervin be given access to a handicap accessible shower and a wheelchair for long distances. ECF 49-2 at 150.

Whether those two orders conflict or there is uncertainty about which order controls, the fact remains that Mr. Ervin has been provided with reasonable accommodations within the confines of North Branch Correctional Institution. His desire to be transferred to another prison based on his disability is a matter that is outside of the scope of responsibility for these defendants.

In short, the medical providers have done all they could have conceivably done to ensure Mr. Ervin's housing assignment addresses his particular disabilities. Defendants are entitled to summary judgment on this claim.

## IV.   Conclusion

By separate Order which follows, Mr. Ervin's motions to file an amended complaint and for default judgment (ECF 51, ECF 56) are DENIED; the claims against defendant Corizon are DISMISSED; and the individual defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment (ECF 49), is GRANTED.

October 3, 2022                                    _____/s/_____
Date                                               Ellen L. Hollander
                                                   United States District Judge